IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

YE XU,

                    Plaintiff,

        v.                                              OPINION and ORDER

BOARD OF REGENTS OF THE                                 16-cv-510-jdp
UNIVERSITY OF WISCONSIN
SYSTEM,

                    Defendant.

Pro se plaintiff Ye Xu, a librarian at the University of Wisconsin-Madison, alleges that administrators at the University of Wisconsin System discriminated against her on the basis of her race and national origin. She brings Title VII claims for disparate treatment, retaliation, and hostile work environment. At the root of her complaint is a disagreement whether a Japanese-language newspaper published in Taiwan during the period of Japanese control should be categorized under "Taiwan" or under "China." Xu contends that workplace conflict following this dispute is a manifestation of discrimination against her because she was born in mainland China. After considering the parties' briefs and supporting evidence, I will grant defendant's motion for summary judgment. No reasonable jury could conclude on the evidence before me that library administrators discriminated against Xu or subjected her to a hostile work environment.

PRELIMINARY MATTERS

## A. Motion to compel

Xu has filed a motion to compel defendant to more adequately answer parts of her second set of requests for admission and for production of documents, which she served on defendant in July 2017. Dkt. 24. But the motion to compel comes far too late to consider before issuing a decision on summary judgment.

Xu filed the motion to compel on November 29, 2017, after her original August 14 summary judgment response deadline and even after the extended November 13 deadline I gave her to submit an amended summary judgment response. In its preliminary pretrial conference order, the court warned Xu that discovery disputes would need to be timely raised. *See* Dkt. 8, at 7 ("If the parties do not bring discovery problems to the court's attention quickly, then they cannot complain that they ran out of time to get information that they needed for summary judgment or for trial."). The parties' summary judgment briefing is complete and ready for review. Because I will grant summary judgment to defendant, there is no need to consider Xu's motion to compel any further.

## B. Adequacy of Xu's summary judgment response

Xu's original response to defendant's motion for summary judgment was inadequate; her responses to defendant's proposed findings of fact, *see* Dkt. 16, were actually long legal arguments responding to statements defendant made in its brief. In an October 25, 2017 order, I granted defendant's motion for an order directing Xu to file a new summary judgment response. Dkt. 19. Defendant contends that I should disregard many of Xu's new responses to its findings of fact, Dkt. 21, as "largely non-responsive and unsupported by any admissible evidence." Dkt. 22, at 1. Xu's new responses are not perfect, but they are not as flawed as

defendant suggests. Xu begins that document by stating under penalty of perjury that her following statements are true, essentially converting that document into a declaration. I will credit all of Xu's statements that fall within her personal knowledge. And much of her other statements refer to exhibits submitted by either side, so I will consider those as well. Ultimately, as I will explain below, Xu's problem is not with the form of her submissions; it is that the evidence simply is not enough to allow a reasonable jury to conclude that defendant discriminated against her.

## C. Disability discrimination

In its summary judgment brief, the state says that Xu's discovery responses suggested that she might be attempting to bring a claim for disability discrimination, under the theory that the library did not do enough to accommodate her after the workplace altercations made her ill. Xu's response is somewhat unclear, but I take her to be saying that she was not disabled and that the library actually misled her by suggesting she seek a disability accommodation rather than addressing her complaints of racial bias head on. But even if it were her intention to bring a disability discrimination claim, I would not allow her to do so at this point. Her complaint contains no trace of an allegation that could plausibly support a disability discrimination claim. And I will not entertain brand-new claims at summary judgment. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002))).

UNDISPUTED FACTS

Plaintiff Ye Xu is an Asian woman who was born in China. She also goes by the name Dianna. In 2006, Xu gave up her Chinese citizenship and became a naturalized United States citizen. Xu has worked for the University of Wisconsin-Madison since 2006 as a librarian in the East Asian studies program. In 2010, the Office of the Chancellor offered Xu an indefinite appointment with the General Library System.

## A. Earlier incidents

Although this case is most directly about alleged discrimination against Xu following a 2015 decision about the classification of certain library materials, the parties provide some facts detailing Xu's history with UW-Madison and previous incidents of perceived discrimination.

Between 2006 and 2010, Xu received pay increases as approved by the UW System Administration. But Xu states that there were two several-month periods during which she took on increased workloads for departing coworkers yet was not given increased pay. Xu claims she was the only staff member who did not receive salary increases due to added responsibilities. The extremely long hours Xu worked contributed to her suffering from severe asthma attacks.

Xu believes that her supervisor for at least part of this time, Mary Rader, discriminated against her by (1) considering Xu's concerns about her long hours to be "complaining"; (2) hiring a replacement for the Japanese studies librarian position, one of the open positions that Xu had taken on, without notifying Xu of the hire; and (3) giving other employees some tasks that should have belonged to Xu. The Japanese studies replacement also would not cooperate with Xu and falsely told others that Xu had pushed the previous librarian out of the job.

In November 2009, Xu met with library administration about her complaints about Rader's alleged discrimination. Xu says that she was told, "You are not allowed to make a complaint that the Library discriminated against you. If you believe it, you should bring a lawsuit. We have a number of offices on campus handling complaints. If you don't use these services but keep complaining, we will sue you." Dkt. 21, at 25–26.

In December 2010, Rader suggested that Xu should not have taken time off to be with her mother during a medical emergency that led to her death. Xu sent a series of emails to administration staff complaining about Rader and asking to be supervised by someone else. Xu met with Nancy Graff Schultz, the General Library Systems associate director for business administration, who told Xu that Xu used inappropriate inflammatory language in making her complaints.

In March 2011, at both Xu's and Rader's request, the administration changed Xu's supervisor to Lisa Saywell. But Graff Schultz said that the allegations against Rader were investigated and determined to be unfounded, and that additional unfounded claims would not be tolerated.

Defendant says that Xu did not have any issues with Saywell, but Xu disagrees. Xu says that she was forced to abandon a planned extended vacation because Saywell insinuated that she should only take her vacation time "a couple of days here and there." Yet Saywell took long vacations herself.

Karla Strand began serving as Xu's supervisor around September 1, 2015, and the events at the core of Xu's claims took place while Strand was Xu's immediate supervisor. A few days before Strand formally became Xu's supervisor, a manager from the library cataloging department emailed Strand to tell her that an employee of that department and Xu had

exchanged emails that Xu said showed that the employee (who was Taiwanese) was prejudiced against those from mainland China. The manager told Xu that he was looking into the situation and suggested that Xu not communicate directly with the employee. The record does not contain further information about this incident.

## B. Taiwan database incident

On September 16, 2015, a student submitted a request to have the database "Taiwan Nichinichi Shinpo (1898-1944)" recategorized on the library website. Taiwan Nichinichi Shinpo was a Japanese-language official newspaper of the Taiwanese government while it was under Japanese colonial rule.[1] At the time, the East Asia area of the library's database catalog included headings for Chinese, Japanese, and Korean library resources. The Taiwan Nichinichi Shinpo database had been categorized the heading "Specific Databases – China." The student asked that it be categorized under a new heading, "Specific Databases – Taiwan." The request was forwarded to Xu on September 16, 2015.

Two days later, Xu forwarded the email to Strand, and explained why the Taiwan Nichinichi Shinpo database was listed under the "Specific Databases – China" heading. Xu said that she based this decision on the 1979 "Joint Communique of the United States of America and the People's Republic of China" and United Nations General Assembly resolution 2758, which recognized the People's Republic of China. Xu explained that she did not want to participate in political debate and requested confirmation from Strand if her decision was consistent with Strand's direction.

---

[1] *See* https://search.library.wisc.edu/database/UWI50181.

After receiving the request and Xu's response, Strand researched how other university libraries organized Taiwanese materials. Specifically, Strand researched whether other university libraries had a Taiwan Nichinichi Shinpo database, and if so, how it was categorized. Strand reviewed websites and databases maintained by numerous top research universities including the University of California-Irvine, Duke, Yale, the University of Chicago, New York University, the University of Texas at Austin, Stanford, and UCLA, among others. Several major universities categorized it under Japanese studies. Strand says that some universities placed it under a Taiwan heading, but she does not provide any evidence showing this to be the case. Xu says that no university did this and provides printouts of other universities, none of which showed a separate Taiwan heading. Xu also provides documents from the Library of Congress suggesting that it categorizes Taiwanese materials under a more general China heading.

Strand also researched what universities had Taiwan studies programs or initiatives such as the one at UW-Madison. She says that many prestigious universities offered Taiwan-focused programs, but does not provide any evidence directly showing this to be the case. Xu appears to agree that there are other major universities with Taiwan studies programs, but maintains that none of the universities mentioned created an independent Taiwan heading cataloging East Asian resources.

Strand also found an online research guide created by Xu that had a separate box with the heading "Useful Resources – Taiwan." Strand says this helped her determine that it "should not be a problem" to do something similar for East Asia databases on the library's website. But Xu says that the Taiwan heading in the guide actually fell under the larger China heading.

Xu met with Strand in Strand's office on September 21, 2015, to discuss the database issue. Xu remained adamant that the database should remain under the China heading and that a separate Taiwan heading should not be created.

Strand concluded that listing a Taiwan-centered database on one of UW-Madison's library websites would increase accessibility for students and would not offend general international recognition of the "One China" policy. Strand spoke with other administrators, including her supervisor, Doug Way, regarding the request and her research into other universities. They did not see any problem with potentially listing the database under its own "Specific Databases – Taiwan" heading or multiple headings (Taiwan, China, and Japan).

After reviewing the websites and information provided by Xu, and exploring Xu's own research guide, Strand decided to accept the student's request and to list the Taiwan Nichinichi Shinpo database under its own new heading of "Specific Databases – Taiwan," as well as the China and Japan headings. Although Strand would have preferred to have the database placed under all three headings, technological limitations forced Strand to pick one, and she chose Taiwan.

Strand and Xu met on October 16, 2015, and Strand informed Xu of her decision. As her supervisor, Strand had the authority to address the student's request and direct that a change be made to the East Asian Studies Database page. Strand says that Xu reiterated her disapproval and continued to argue that by adding this new heading that the library was making a political gesture by disregarding the United Nations' "One China" policy and essentially recognizing Taiwan as its own country separate from China. Strand also says that Xu became very angry during the meeting, stood up when speaking, raised her voice, and interrupted Strand when Strand was trying to explain her decision-making process.

In Xu's version of the conversation, "Strand did not allow Xu to finish one sentence. Strand yelled at Xu: 'This is not a discussion! I already made the decision! You don't have to do it! I'll do it! I'll talk to the [Taiwanese] student!'" Dkt. 21, at 45. When Xu tried to leave the meeting, Strand pointed to the chair, ordered Xu to sit down, accused Xu of insubordination, and yelled at Xu, "You are unprofessional! You just serve your country!" *Id*. at 46. (Strand disputes that she said this.) Xu says that these comments devastated her, she felt dizzy and had a headache, and she was worried she might be having a stroke. Strand told her that "she understood Xu's 'strong feelings' about her culture but that 'we have to treat all students equally.'" *Id*. Strand then gestured at Xu's emails and said, "Look at your emails . . . look at those emails" in what Xu thought was a "slightly mocking way" that belittled her English-language skills. *Id*.

Following the meeting, Strand sent an email to Xu listing out the specific steps she took in considering the student's request, Xu's personal concerns, the organizational methods of other research universities, and reiterating that this was an access-to-information issue and that Xu had made a similar decision in her research guide. Strand also reiterated that Xu's behavior and tone during the meeting were unacceptable and would not be tolerated in the future, that disagreements were fine, but they had to be able to address them professionally.

Strand, Way, and Graff Schultz exchanged emails discussing what Strand called "the very difficult meeting" with Xu. Way informed Graff Schultz that Xu was planning to speak to Graff Schultz about the situation.

On October 19, 2015, Strand received an email from Xu, in which Xu reiterated her reasoning for why she initially listed the database under the China heading. Xu accused Strand of yelling at her, not considering her opinion, and telling her that she should "just serve [her]

country." Xu requested that her name be taken off of the East Asian Studies page and stated her belief that she could no longer report to Strand as her supervisor.

The same day, Xu met with Graff Schultz. Xu characterized Strand's response as rude and yelling without giving Xu an opportunity to speak. Graff Schultz indicated that she would gather information and get back to her. Xu said that she could not work with Strand any further and requested a change in supervisor. Xu also told Graff Schultz that she was ready to file a formal complaint. Xu asked Graff Schultz where she should go to file a formal complaint, but Graff Schultz did not provide Xu with a response. She did later send Xu information about the disability accommodation policy and the hostile and/or intimidating behavior policy to Xu. But neither of these items discussed discrimination policies.

Via email, Way and Strand discussed Xu's request for her name to be removed from the East Asia Databases webpage and decided that it could not be removed from the East Asian Studies page because she was the East Asian studies librarian.

Graff Schultz met with Xu again on November 3, 2015, at which point Xu produced a letter from her physician, Dr. Jason Dambach, stating that Xu was suffering stress and high blood pressure from conflict with her supervisor. Dambach requested a new supervisor or other accommodation. Graff Schultz met with the campus disability coordinator and decided that there was not enough information to warrant a change. They requested more information from Dambach. Ultimately, Dambach recommended a joint meeting be scheduled to resolve and set standards for future interactions.

Graff Schultz and Way concluded that it would be a good idea for Strand and Xu to cancel their monthly in-person meetings. Instead, they would meet with an "Employee Assistance Specialist" from the Employee Assistance Office to facilitate discussion and

standards for interactions. The Employee Assistance Program (EAP) is meant to help employees and supervisors work through individual work-related concerns and "facilitate discussion and reconciliation between staff with personal or professional disputes." The state says that this program is completely voluntary. Xu says that she was pressured into participation.

On December 8, 2015, while Xu was drafting an alternative proposal seeking a supervisor change, she collapsed in the campus writing center and was taken to the hospital. Xu says that she wrote to Graff Schutz and Way saying that her blood pressure was dangerously high.

On December 9, 2015, Graff Schultz issued a letter outlining what Xu's options were with regard to her request for a change of supervisors. Graff Schultz reiterated that her medical documentation to date and the recommendations of her treating physician did not support the need for a change in supervisors. Xu had three options for moving forward: (1) she could visit her treating physicians to see if her recent medical issues had changed her disability status. If she believed her disability status had changed, she would be required to submit similar documentation as she did for her previous request; (2) Xu could file an appeal as outlined in the previous letter; or (3) Xu could agree to work through this situation with the Employee Assistance Office. Graff Schultz gave Xu a week to make her decision.

On December 16, 2015 Graff Schultz received a letter from Dr. Dambach stating that he and Xu had discussed the options available to Xu. Dambach stated that Xu would like to work with the aid of the Employee Assistance Program to work through the situation. Xu says that Graff Schultz misled Dambach into thinking the EAP was the only acceptable avenue.

Xu was instructed to send Strand her monthly reports via email instead of providing Strand with her monthly updates in person. On December 9, 2015, Strand sent an email to Xu stating that their monthly meeting for December was canceled and that Xu was to provide a brief update as to her work for the semester. Xu was instructed to provide the information to Strand by December 17, 2015. On December 17, Xu sent her monthly report to Way and Graff Schultz, but she failed to copy Strand on the email. Defendant says that Way instructed Xu a second time to forward the email to Strand, but Xu failed to do so until December 21. Xu disputes that Way told her this. Way issued Xu a "non-disciplinary letter of expectation," instructing her that she was to meet all deadlines given by her supervisor, or to notify her supervisor in advance if she was unable to meet her deadline. The letter also stated, "Although this letter is not disciplinary and will not be placed in your personnel file, this letter will be retained by your supervisor. Failure to follow the above directive will result in the scheduling of a pre-disciplinary meeting and possible discipline." Dkt. 14-2, at 42.

Also on December 17, Xu delivered a letter to Graff Schultz stating that Strand's abusive behavior was causing her to suffer "uncontrolled" hypertension, mentioning Strand's remark that Xu sought only to serve her country, and requesting to be assigned a temporary supervisor. Xu said that the EAP was not going to help her. Xu believes that Way's "non-disciplinary letter" was in response to this complaint.

In an email dated January 7, 2016, Xu was instructed to email her next monthly report to Strand by January 14, 2016. Xu did not send her monthly report until January 29, 2016. As a result, Strand and Graff Schultz issued Xu a "Pre-Disciplinary/Investigatory Meeting" letter on January 28, 2016, stating that they intended to hold a meeting in February to investigate Xu's "insubordination or failure or refusal to carry out assignments." Dkt. 14-2, at

45. Xu apologized for not sending her report to Strand by January 14, and she said that she did not see the deadline. Strand and Graff Schultz met with Xu on February 1 and had a "very cordial meeting." The next day, Graff Schultz sent Xu a letter informing her that there would be no discipline and no further action regarding the issue of failing to provide Strand with reports. But a series of emails sent between Strand, Way, Graff Schultz, and Patrick Sheehan, director of workforce relations for the Office of Human Resources, between January 21 and 28, 2016, shows that they discussed the procedures for terminating someone with an indefinite appointment.

Xu and Strand met together with the Employee Assistance Program several times between January and May 2016 but otherwise did not meet face-to-face. I take Xu to be saying that during individual portions of the process, she complained to the EAP staff about Strand's discrimination. During the summer of 2016, Strand and Xu began to have face-to-face meetings, and they have worked together professionally since then. As of June 1, 2017 the Memorial Library area studies bibliographers, including Xu, were all re-assigned to a new supervisor.

Employee performance reviews are normally scheduled for March of a given year. Xu's March 2016 evaluation was delayed several months because of vacations and because the administration held a discussion regarding who should complete the evaluation for the previous year because of the conflict between Strand and Xu. It was decided that Way should conduct the evaluation. The evaluation contained criticism of Xu's struggle with meeting deadlines and "inability to resolve and move beyond conflicts." Dkt. 14-1, at 6. More specifically, it said, "Dianna's conflict with her supervisor over what began as a minor database classification issue and escalated into a one-time verbal dispute has disrupted her work and impacted the work of

13

others for nearly a year." *Id*. It also stated, "The GLS has investigated these claims and found no evidence to support them. If Dianna disagrees with the outcome of this investigation, she should raise the issue with the Office for Equity and Diversity." *Id*. at 7.

Since these events, Xu has continued to work as the East Asian studies librarian and suffered no loss in pay, benefits, job duties, or education or travel opportunities.

Xu filed a formal complaint with the United States Equal Opportunity Commission (EEOC) on March 11, 2016, and the EEOC issued Xu a right-to-sue letter in April 2016.

## ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

Xu's claims are brought under Title VII of the Civil Rights Act for discrimination and hostile work environment based on her race and national origin.[2] Title VII makes it unlawful

---

[2] Xu also makes passing reference to the Wisconsin Fair Employment Act, which prohibits discrimination because of race and age, among other things. *See* Wis. Stat. § 111.321. However, the WFEA is generally interpreted in the same manner as federal discrimination statutes.

for an employer to fail or refuse to hire an individual because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. §; 2000e-2(a)(1). It also "protects persons not just from certain forms of job discrimination [and harassment], but from retaliation for complaining about the types of discrimination it prohibits." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); 42 U.S.C. § 2000e–3(a). And it prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

## A. Disparate treatment

The state approaches the disparate treatment claim by applying the "direct" and "indirect" methods of proof long used by courts to assess discrimination claims. The Court of Appeals for the Seventh Circuit has recently warned courts against sifting evidence into two separate categories for analysis under these two methods. Under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the test "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." Therefore, I will consider plaintiff's evidence as a whole and not distinguish between direct and indirect evidence or methods of proof.

In determining whether the evidence would permit a reasonable factfinder to conclude that defendant discriminated against Xu because of her race or national origin, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains relevant

---

*Marten Transport, Ltd. v. Dept. of Industry, Labor and Human Relations*, 176 Wis. 2d 1012, 1020, 501 N.W.2d 391, 395 (1993). Xu has not suggested that there are any relevant differences between the WFEA and Title VII for the purpose of this case. Therefore, I conclude that Xu's WFEA claims rise or fall with her federal discrimination claims.

as a "means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *See, e.g., Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017). To prove that defendant discriminated against her, Xu must make a prima facie case with evidence that: (1) she is a member of a protected class; (2) she met defendant's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008). The parties do not dispute that Xu is the member of a protected class.

Satisfying all four prongs of the prima facie case shifts the burden to the defendant "to produce a legitimate, noninvidious reason for its actions." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). If the defendant rebuts the prima facie case, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id*. To succeed on a claim for employment discrimination based on race, a plaintiff need not show that race was the exclusive reason for the defendant's actions; rather, a plaintiff need only show that race was a motivating factor. 42 U.S.C. § 2000e-2m; *see also, e.g., Hossack v. Floor Covering Assocs. of Joliet*, 492 F.3d 853, 860 (7th Cir. 2007).

Xu's claims start with the library's decision to respond to a student request by creating a separate classification of Taiwanese library materials on the same level with those of Chinese materials. Xu says that, in the midst of a heated discussion between Xu and Strand about this issue, Strand told her "You just serve your country." I agree that a reasonable inference from this comment is that Strand perceived Xu to hold pro-China bias on the issue because of her

ethnicity and national origin.[3] But that comment alone does not support a traditional claim for disparate treatment:[4] Xu still needs to identify a materially adverse employment action.

"'[N]ot everything that makes an employee unhappy is an actionable adverse action.'" *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). "[A]n adverse action must materially alter the terms or conditions of employment to be actionable under the antidiscrimination provision of Title VII. . . . This means that the action must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012) (internal citations and quotation marks omitted). The Seventh Circuit has outlined three broad categories of events that may qualify as actionable adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id.* (quoting *O'Neal*, 392 F.3d at 911).

---

[3] The state argues that "Xu's insistence that 'your country' referred to China makes little sense in the context of the larger conversation about how to list reference materials on a website," Dkt. 13, at 15. But the connection is obvious: Xu took a pro-China side on an issue plausibly related to the question whether Taiwan is a sovereign nation.

[4] I will also consider this comment in the context of a "hostile work environment" claim below.

Xu fails to identify any action taken by library officials significant enough to qualify as an adverse employment decision. For instance, this is not a case in which the employee was demoted or terminated; she kept her job at the same rate of pay.

I take Xu to be saying that the decision to create a separate Taiwan database was so misguided that continuing to place her contact information alongside it damaged her reputation. *See* Dkt. 20, at 22–23 ("Xu is entitled to refuse to have her name associated with any unconventional conduct, especially in cyberspace."). In other words, the *classification decision itself* was the adverse employment action. Although the third category of adverse actions listed above can encompass cases in which an employer subjects an employee to humiliating or degrading conditions, Xu comes nowhere close to showing that the decision here was significant enough to fit under this theory.

While I have no doubt that Xu considers the decision to create a separate Taiwan heading to be seriously wrongheaded, "the existence of a materially adverse employment action is based on the objective conduct of the employer rather than the subjective, psychic response of the employee." *Mirza v. Neiman Marcus Group, Inc.*, 649 F.Supp. 2d 837, 858 (N.D. Ill. 2009). It is undisputed that Xu took this decision extremely hard and has found this sequence of events and previous work-related disputes to be extremely stressful. But she fails to set forth an objective case that she was discriminated against.

As a starting point, Xu expresses concern over the university making a decision counter to United States diplomatic policy, but the university is not charged with violating international treaties; this is an employment discrimination case. She considers this decision to be an egregious breach of diplomatic policy. But the United States' "One China" policy is a diplomatic principle that simply would not appear to have any applicability to state-run

university libraries. It is far from obvious that a university library's decision to categorize Taiwanese materials separately from Chinese materials carries any influence on the geopolitical scene. It is certainly reasonable to assume that university students, faculty, and administrators may at times seek to express their viewpoint on controversial political issues by influencing internal university policies, and that may have been the student's intention here. But it is up to Xu to show how this decision could support a discrimination claim.

Xu states that UW is "constrained by feudal convention and the U.S. Library of Congress regulations and rules." Dkt. 21 at 44. She provides an expert witness report from Mei Wang, an "Information Resources Specialist Senior" working as a "Chinese Cataloger" at the University of Michigan, who states that academic libraries in the United States and Canada "generally follow the US Library of Congress Rules." Dkt. 10, at 2. And although the parties provide somewhat conflicting evidence about the *practice* of categorizing Taiwan separately in university libraries, the state's evidence does not show that other universities have made the exact decision about splitting Taiwanese library materials into its own heading alongside China. The Library of Congress materials and other evidence Xu provides suggest that the Library of Congress would probably not have made the same decision Strand did here. For purposes of this opinion, I will assume that the Library of Congress would have kept the Taiwanese materials under the China heading.

But although Xu is likely correct about the consensus library practice, she does not explain why the University of Wisconsin is "bound" by the consensus or Library of Congress's standards, or why departure from those rules would have a negative effect on her reputation. None of her evidence shows that UW slavishly follows the Library of Congress, and even if it normally did, this court usually does not resolve Title VII claims by parsing the wisdom of

employers' business decisions. Federal courts "do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003). A jury would need far more evidence into library practices and about what would be considered scandalous or embarrassing within that context to be able to infer that Xu's name placed next to the Taiwan category would be so harmful to her career that the decision could be considered an adverse employment decision. Xu lost a battle about the classification of library materials, but that is not enough to maintain a disparate treatment claim. *See Watson v. Potter*, 23 F. App'x 560, 564 (7th Cir. 2001) ("neither a 'bruised ego,' nor public humiliation rises to the level of an adverse employment action." (citations omitted)).

Xu also points to personnel-related decisions more traditionally raised in employment-discrimination cases. Xu was reprimanded twice, she received some negative comments in a performance evaluation, and I will assume that she was forced to participate in the "Employee Assistance Office" counseling plan.[5] But minor counseling or performance-improving steps like these do not run afoul of Title VII unless the alleged discrimination leads to a "tangible job consequence." *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004) ("There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action."); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (same); *see Johnson v. Johnson & Johnson*, 67 F. Supp. 3d 1001, 1010 (N.D. Ill. 2014) (attendance warning did not constitute adverse employment action because it did not result in any tangible consequences). There is no evidence that Xu was subjected to such a tangible consequence.

---

[5] Defendant says that participating in this plan was voluntary, but Xu states that she was pressured into participating. At this stage of the proceedings, I must credit Xu's version.

Xu also points to a series of emails sent between Strand, Way, Graff Schultz, and Patrick Sheehan discussing how with an indefinite appointment could be terminated. I agree with Xu that this shows that these officials were *considering* terminating her. But the possibility of disciplinary action is not a materially adverse employment action. *See, e.g.*, *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) ("While we do not doubt that the possibility of discipline can be stressful, we have previously held that this kind of threat is not enough to support a claim for retaliation."); *Cole v. Illinois*, 562 F.3d 812, 814, 816 (7th Cir. 2009) (placing plaintiff on improvement plan and telling her she would be fired if she did not sign it was not adverse action). And in this case the discussions she cites were private and did not even amount to an explicit threat of termination.

Xu also fails to show that the reprimands occurred because of her race. On the face of it, the reprimands make perfect sense given that Xu failed to meet the revised plan for how she was supposed to provide written reports of her progress to Strand.

 This claim raises the issues of defendant's legitimate job expectations and Xu's treatment compared to similarly situated employees outside of her protected class, which are closely tied to the question whether defendant's proffered reasons for its actions was a pretext to cover defendant's true discriminatory purpose. "[T]o show pretext, a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.'" *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)). Because these issues are so closely related, I will consider them together. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) ("[T]he question of whether he was meeting Sybase's legitimate

expectations merges with the question of whether Sybase's reasons for firing Senske are pretextual.").

Xu conclusorily states that no one else in the library system was treated the way she was, but she does not identify anyone *similar*—that is, anyone who was in position to suffer the same type of reprimand, or anyone who was faced with a similar library-materials-sorting issue. She does not provide evidence showing that other library employees who missed deadlines were given different reprimands.

Instead, all we have is the record of Xu's reprimands. And it is undisputed that she did not meet the deadline for providing Strand monthly updates. Xu provides excuses for those violations, but that is beside the point. She had actually broken the deadlines, which raises a reasonable inference that administrators reprimanded her for that reason. They did eventually agreed to work with Xu to provide more clear notices of those deadlines, which, if anything, shows that they eased up on the reprimand process when confronted with evidence of Xu's good faith in attempting to comply with deadlines. Xu simply does not provide any facts suggesting that they reprimanded her for any other, pretextual reason.

## B. Retaliation

Xu also claims that defendant retaliated against her by reprimanding her for complaining about the alleged discrimination in conjunction with the Taiwan database incident. To make out a claim of retaliation under Title VII, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). For her retaliation claim, Xu must prove the retaliatory animus was the "but-for" cause of the

adverse employment action, not merely a motivating factor. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

The state initially contends that the alleged retaliatory reprimands postdated any formal complaints (Xu's EEOC complaint came after the reprimands) and that her informal complaints (her October 19, 2015 email to Strand and her December 17, 2015 letter to Graff Schultz) did not actually raise complaints of discrimination. But Xu's informal complaints can constitute protected conduct, *e.g.*, *Davis v. Time Warner Cable of SE Wisconsin, L.P.*, 651 F.3d 664 (7th Cir. 2011); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009), and at this point I will assume that Xu's reference to Strand's remark about Xu serving her country is sufficient to show that Xu was complaining about perceived racial animosity.

But even granting these assumptions, this claim fails for the same reasons as Xu's disparate treatment claim, stated above. She did not suffer an adverse employment decision, and there is no reason to think that she was reprimanded for any reason other than the official reason: she missed to deadlines for making her monthly reports to Strand. Therefore, I will grant summary judgment to defendant on Xu's retaliation claim.

## C. Hostile work environment

Although Xu's complaint does not explicitly contain a Title VII claim for hostile work environment, her main allegation is about Strand's hostile remark about Xu serving her country, and she did alleges that she was discriminated against "prior to and during the above described events [about the Taiwan database]." So I will construe her complaint as including a claim for hostile work environment.

To prevail on such a claim, a plaintiff must show that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her race or national origin; (3) the harassment

was severe or pervasive enough to alter the conditions of her employment; and (4) there is basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833–34 (7th Cir. 2015). "To rise to the level of a hostile work environment, conduct must be sufficiently severe or persuasive to alter the conditions of employment such that it creates an *abusive* relationship." *Id.* at 834 (original emphasis). Courts examine "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017)

Xu's hostile work environment claim fails because she falls far short of showing that she faced severe or pervasive discrimination. The core of her case is the heated argument she had with Strand about the Taiwan Nichinichi Shinpo database and Strand's alleged comment that Xu "just serve[s her] country." A jury could infer that this comment and Strand's demeanor in general during that conversation was hostile. But that sole conversation is the lynchpin of Xu's claims; it was not followed up with similarly disparaging remarks. "[O]ffhand comments, and isolated incidents (unless extremely serious)" are not sufficient to support a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). The only other negative events occurring after that were the reprimands she received and remarks on her performance review. But as I have discussed above, Xu fails to show that the reprimands were given for any reason other than the fact that she missed her deadlines.

Xu tries to bolster her claim by presenting evidence of her strained relationship with other supervisors and coworkers. But Xu fails to show that those supervisors or coworkers harassed her because of her race. Title VII "does not guarantee a utopian workplace, or even a

24

pleasant one." *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). *See also Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) ("Many employees have to put up with some amount of rude, arrogant, or boorish behavior at work . . . ."). Moreover, most of those events happened so long ago that Xu at best describes a workplace where she only sporadically encountered harassment, which is not enough to maintain a hostile work environment claim. See, e.g., *Washington v. Am. Drug Stores, Inc.*, 119 F. App'x 3, 6 (7th Cir. 2004) ("sporadic, isolated and . . . unrelated" harassing behavior insufficient to support hostile work environment claim); *Dey v. Colt Constr. & Develop. Co.*, 28 F.3d 1446, 1456 (7th Cir. 1994) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."). Therefore, I will grant summary judgment to defendant on Xu's hostile work environment claim.

Because Xu fails to present evidence in her favor sufficient to survive summary judgment on any of her claims, this case will be dismissed.

ORDER

IT IS ORDERED that:

1. Defendant Board of Regents of the University of Wisconsin System's motion for summary judgment, Dkt. 11, is GRANTED.

2. Plaintiff Ye Xu's motion to compel discovery, Dkt. 24, IS DENIED.

3. The parties' pending pretrial motions are DENIED as moot.

4. The clerk of court is directed to enter judgment for defendant and close this case.

Entered January 22, 2018.

BY THE COURT:
/s/

_____
JAMES D. PETERSON
District Judge